# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 4, 2024 Session

## STATE OF TENNESSEE v. CORNELIUS WILLIAMS IV

**Appeal from the Criminal Court for Shelby County**
**No. 22-00996      Carlyn L. Addison, Judge**
_____

## No. W2023-01620-CCA-R3-CD
_____

The defendant, Cornelius Williams IV, was convicted by a Shelby County jury of second-degree murder and convicted felon in possession of a handgun, and the trial court imposed an effective sentence of twenty-five years in the Department of Correction. On appeal, the defendant argues: (1) the evidence is insufficient to sustain his convictions; (2) the trial court committed plain error in providing the jury with an erroneous instruction; (3) the trial court committed plain error by allowing the State to introduce a pro se pleading purportedly filed by the defendant; (4) the defendant is entitled to relief based on cumulative error; and (5) the defendant's sentence for convicted felon in possession of a handgun is illegal. Following a thorough review of the record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court, but we remand for entry of a corrected judgment in count two indicating the statutorily authorized release eligibility of eighty-five percent on the handgun conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., joined. KYLE A. HIXSON, J., filed a separate opinion concurring in part and dissenting in part.

Lance R. Chism (on appeal) and John Dolan (at trial), Memphis, Tennessee, for the appellant, Cornelius Williams IV.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Regina Lucreziano, Lessie Rainey, and Monica Timmerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## *Facts and Procedural History*

The defendant was indicted for second-degree murder and convicted felon in possession of a handgun after his girlfriend, Shaniece Moore, was found shot to death in a car outside of their home and eyewitness testimony tied the defendant to the murder.

The victim and the defendant lived in a home on Madeline Circle in Memphis, along with their two-year-old daughter, K.W., and the victim's four-year-daughter from another relationship, C.M. On October 3, 2021, the victim and her best friend, Jasmine Buford, went downtown together from 10:00 a.m. to 12:00 p.m. and returned to the victim's house around 1:00 p.m. The defendant arrived around 6:00 or 7:00 p.m., when it was getting dark outside. Ms. Buford and the defendant got into an argument, and Ms. Buford decided to go home because the defendant was not "in a good mood." Ms. Buford elaborated that she had a "bumpy" relationship with the defendant. As Ms. Buford was preparing to leave, the defendant said, "come back at 3 o'clock again and watch what I do." Ms. Buford and the victim then left to pick up sandwiches for the defendant's lunches for the week and to pick up the victim's daughters from the victim's mother's house. The victim dropped off Ms. Buford at her residence, and Ms. Buford never saw the victim again.

According to Ms. Buford, there were cameras on the exterior of the victim's residence – at the back door, side door, and front door, and both the victim and the defendant had access to the cameras. Ms. Buford knew the defendant had access to the cameras because about three weeks before the murder, the defendant had shown Ms. Buford footage of her hugging a male friend in the victim's driveway. After showing Ms. Buford the footage, the defendant "said that I saved her."

C.M., who was six years old at the trial, testified that the victim picked her up from her grandmother's house and brought her home the night of the incident. C.M. played for a little while and then went to bed. C.M. heard a gunshot but said she did not do anything after hearing the gunshot. C.M. recalled seeing her mother's body "laying on the ground . . . [b]etween the cars," and that the victim was on the ground "[b]ecause somebody murdered her." C.M. remembered going to the child advocacy center and speaking with a lady named "Ms. Pat." C.M. said that she told "Ms. Pat" the truth.

Patricia Lewis, a forensic interviewer at the child advocacy center, interviewed C.M. shortly after the victim's murder. During the forensic interview, which was entered into evidence, C.M. stated that she saw the defendant approach the victim and shoot her in the neck and right side. The victim was sitting in a black car in the driveway when the

- 2 -

defendant shot her, and the defendant dropped the gun on the grass after the shooting. C.M. saw the shooting through the "door window" in the living room.

Ronald Stevenson lived on Debby Street in October 2021, "directly across the street" from the defendant and the victim, and he had a clear view of their driveway from his front door. During the daytime on October 3, Mr. Stevenson was outside barbecuing when he observed the defendant and the victim arguing. The defendant had a gun in his hand. Later that evening, Mr. Stevenson was on his couch when he heard gunfire coming from the direction of the defendant's and victim's house. Mr. Stevenson got up and stepped outside, at which time he saw the defendant either bent down between two cars in the driveway or "fumbling" for something in one of the cars. Mr. Stevenson yelled out to the defendant, "man, that was you shooting," and the defendant responded, "naw and started looking around. [The defendant] walked to the front yard, looked left and right, went towards th[eir] front door, and came back down the side." At that point, Mr. Stevenson went back inside his house. Mr. Stevenson noted that "[t]here was plenty of lighting around" and that he "could see [the defendant] good."

Mr. Stevenson went back outside about five minutes later when his uncle called to say he was at Mr. Stevenson's home, and Mr. Stevenson saw his uncle talking to the defendant "at the gate." The men were discussing a vehicle, and the defendant did not appear to be panicked or upset. Mr. Stevenson did not realize that someone had been shot until after the police arrived. Mr. Stevenson noted that he did not see the defendant crying until after the victim's parents arrived on the scene. After the scene was cleared "[l]ater on that night," Mr. Stevenson saw "the kids [from] three houses down . . . running out the door" of the defendant's and the victim's house. The next day, Mr. Stevenson identified the defendant from a photographic array on which he wrote, "Guy across the street was in a fight with his girlfriend and he had a black and silver gun in his hand."

Mr. Stevenson acknowledged that he had prior felony convictions and was currently on house arrest for a federal conviction, but he maintained that he had not received any promises about the disposition of his case in exchange for his testimony. Mr. Stevenson also acknowledged that his visitors sometimes parked along the curb by the defendant's house and that was a source of contention between him and the defendant.

Tommy Jackson, Jr. also lived on Debby Street in October 2021, approximately "12 to 15 houses down" from Mr. Stevenson. Mr. Jackson had been involved in "a few incidents" where he parked on the defendant's side of the curb when visiting Mr. Stevenson and the defendant complained about him parking there. Despite those incidents, Mr. Jackson said he did not stand to gain or lose anything from the defendant's conviction. On October 3, 2021, around noon, Mr. Jackson was visiting with Mr. Stevenson in Mr.

Stevenson's front yard when he looked across the street and noticed the defendant with a gun in his hand.

Later that evening, around 10:30 or 11:00 p.m., Mr. Jackson went back to Mr. Stevenson's house. As he stepped out of his truck, Mr. Jackson heard the defendant and a female arguing in the driveway of the home on Madeline Circle for approximately fifteen minutes. Mr. Jackson saw the defendant standing "on the passenger side [of the car] with the door open" during the argument. Although it was dark outside, Mr. Jackson could see because there was an exterior light on the defendant's home, as well as a nearby streetlight. Mr. Jackson ultimately decided to return home when Mr. Stevenson did not come outside and, when he parked his car, heard three or four gunshots. The next morning, Mr. Jackson learned that the victim was dead.

Bobby Bingham was sixteen years old at the time of the incident and lived two houses down from the defendant and the victim. From his bedroom window, Mr. Bingham had a "clear" view of the defendant's and victim's driveway. On the night of October 3, 2021, Mr. Bingham was watching television in his bedroom when he heard "[a] loud scream." Mr. Bingham looked out his bedroom window and saw "two figured bodies" in between two cars in the defendant's and victim's driveway and saw "shots coming from a gun." Mr. Bingham said that the two people were the defendant and the victim, and the person holding the gun and shooting was the defendant.

After seeing the gunshots, Mr. Bingham saw the defendant in between the cars trying to pick the victim up and put her in the car. Mr. Bingham explained that there was a streetlight that gave him "clear vision" to see between the cars. Mr. Bingham knew the victim's two children, and he saw one of the children "in the door window" during the shooting. On cross-examination, Mr. Bingham acknowledged that Mr. Stevenson gave him a ride to a prior court hearing in which Mr. Bingham identified the defendant. Mr. Bingham also acknowledged that he had some trouble identifying the defendant at the prior hearing, but then said, "I knew who he was and knew what he looked like so it was . . . easy for me to point out."

The parties stipulated that a call was made to 911 on October 3, 2021, at 10:52 p.m. The caller stated that his "girlfriend's boyfriend or something done shot her or something," and that the victim was sitting in the car in the driveway at the home on Madeline Circle. The caller also said that he heard two gunshots. At one point during the call, the caller also stated, "Alexa show me side camera."

An extraction of the defendant's cell phone showed that the defendant called 911 at 10:52 p.m. on October 3, 2021. The extraction showed that the defendant called "L. Fay" at 11:05 p.m., and the call lasted twenty seconds. The defendant also made two outgoing

- 4 -

phone calls to "Red Jerry." The first call, placed at 11:23 p.m., lasted one second, and the second call, placed at 11:24 p.m., lasted 26 minutes and 8 seconds.

Several Memphis Police Department ("MPD") officers responded to the scene, including Officer Shawna Roten. Officer Roten testified that the defendant appeared calm and did not seem upset when she arrived, but his demeanor immediately changed once the victim's family arrived. The defendant began to "sob and scream[]" and "fell on top of the victim in front of the family." The defendant's behavior returned to normal when officers told him to stand. Officer Roten placed the defendant in the back of her patrol car, and the defendant said "[t]hat he had heard shots fired" and saw the victim "sitting in her vehicle." The defendant claimed that "he did everything for [the victim]," including purchasing a car for her, but that the victim "was sneaky." The defendant admitted that he and the victim "had been through some things but they had squashed it." Officer Roten noted that she did not observe any blood on the defendant.

Officer Roten's body camera footage was played for the jury and showed the defendant telling Officer Roten that he did not know what happened and that he heard two gunshots. The footage showed the defendant throwing himself on top of the victim and crying uncontrollably when the victim's mother arrived. The footage captured the defendant stating as he was placed in the squad car that he was just "getting on" to the victim and her friend about that "little sneaky sh[*]t" that they do.

Lieutenant Charles Winbush and Sergeant Kasandra Smith interviewed the defendant at the police station in the early morning hours of October 4, 2021, during which the defendant provided his version of the events surrounding the murder.

In the videotaped interview, the defendant told the police that he left his home around 12:00 or 1:00 p.m. on the day of the shooting to watch a football game at his cousin's house, and he returned home around 7:00 or 8:00 p.m. The defendant said he was watching a football game on his couch with his daughter when the victim came into the house, gave him some cigarettes, and then went back outside. Shortly thereafter, the defendant heard a scream and two gunshots. The defendant ran outside and looked around, but he did not see anything. A neighbor came over and asked the defendant if he heard the shots. As the defendant was talking to his neighbor, he looked down and noticed the victim sitting in the car in the driveway. The defendant claimed that he performed CPR on the victim.

In the interview, the defendant also discussed the surveillance cameras at the house. The defendant admitted that he could watch the footage from the cameras on his phone or "through Alexa," but he claimed that he could not erase the footage because the victim had the code. The defendant said that when he looked at the footage on his cellphone, the

surveillance cameras picked up the victim coming into the house to bring cigarettes to him and then picked up him going outside after the shooting, "but everything in between was gone." The defendant speculated that the victim may have erased the footage herself because of her "sneakiness."

The defendant told the officers that he thought the victim was seeing another man. He explained that on one occasion, he saw, through his home surveillance footage, the victim's friend, Ms. Buford, hugging a man outside his home. The defendant knew the man was not Ms. Buford's boyfriend. After seeing the footage, the defendant texted the victim and told her that the surveillance footage had saved the victim's life since it showed Ms. Buford, not the victim, hugging the man. However, the defendant opined that if Ms. Buford was bringing men to the victim's house, then the victim was probably bringing men to Ms. Buford's house. Yet, the defendant referred to the victim as "his queen" and his "everything," and he insisted that he had "nothing to do with" the victim's murder.

Lieutenant Winbush thought it "seemed strange" that the cameras did not capture the shooting. Similarly, Sergeant Smith thought "[a] lot" of the defendant's story did not make sense. Sergeant Smith was most skeptical of the defendant's claim that only the victim had access to the surveillance footage because the victim and the defendant lived in the house together. Sergeant Smith attempted to retrieve camera footage from the security company but was unable to do because the victim "didn't pay for the subscription."

Crime scene officers processed the scene and ultimately collected three .40-caliber shell casings from the driveway, as well as a projectile from the driver's side floorboard of the vehicle. Crime scene officers also processed the inside of the residence. A .45-caliber handgun was found inside a kitchen drawer, a rifle was found in a bedroom closet, and magazines and live rounds of ammunition were found in the bedroom.

The victim's mother, Linder Taylor, last saw the victim alive on October 3, 2021, around 8:30 or 8:45 p.m. when the victim picked up her two children. Later that same evening, Mrs. Taylor received a call from the defendant, telling her that "someone just shot [the victim]." Mrs. Taylor rushed to the victim's home, and the defendant ran to her yelling "oh my [G]od, oh my [G]od," and then "fell on top of her. He laid his body on top of her[.]"

Willie Taylor, the victim's stepfather, received news of the victim's death and rushed to the victim's home with his wife, Linder. Mr. Taylor remained at the crime scene until 4:00 or 5:00 a.m. when he went home to take a nap. Mr. Taylor returned to the scene several hours later and noticed that the door had been kicked in. Upon entering the house, he noticed that the place "was ransacked" and several televisions and miscellaneous items had been taken. Mr. Taylor knew that the victim had a gun but did not know where she

- 6 -

kept it. He knew that the defendant also had a gun, which he kept in the couch in the living room.

Sergeant Mario McNeal with the MPD responded to the scene after a news reporter who was doing a story at the location called to report a burglary. Sergeant McNeal observed that the front door was "kicked in," and the house was "ransacked." Sergeant McNeal did not locate any security cameras at the property and was unable to determine who was responsible for the burglary.

About two and a half weeks after the shooting and burglary, MPD officers responded to a call regarding a potential carjacking. Officer Dominic Starks testified that they were able to have the carjacked vehicle stopped through its OnStar system, and as a result of the sudden stop, the "driver[] and passenger were ejected from the vehicle." One suspect was located near the curb and another suspect in a nearby tree line. Officer Starks took the second suspect into custody and then "checked the immediate area that [the suspect] . . . was in," locating a black .40-caliber handgun. Officer Starks learned that the names of the juveniles involved in the carjacking were Darius Wilborn and Dontavious Morton. Shandra Lynch, a firearms examiner with the Tennessee Bureau of Investigation ("TBI"), determined that the .40-caliber shell casings found at the scene of the murder were fired from the handgun recovered by Officer Starks. Sergeant Kasandra Smith learned of the murder weapon's recovery "[f]rom some juveniles" but did not consider the juveniles to be suspects "[b]ecause all the evidence pointed towards [the defendant]."

The parties stipulated that on October 24, 2021, the defendant made a call from the Shelby County Jail to an unidentified woman. In the call, the defendant claimed to have only discovered the victim's body. The woman told the defendant that she heard the victim was the defendant's live-in girlfriend, and the defendant responded, "We know that's a lie." The defendant also denied being intimate with the victim.

Medical Examiner Doctor Danielle Harrell performed an autopsy on the victim and found that she sustained four gunshot wounds. Doctor Harrell determined that the victim's cause of death was multiple gunshot wounds and manner of death was homicide.

The State entered into evidence a pro se pleading titled, "Motion to File Civil Suite [sic] For Wrongful Incarceration and Deformation [sic] of Character," that the defendant attempted to file in civil court. In the pleading, the defendant stated:

> On October 3, 2021, I Cornelius Williams was at home asleep on the couch with my baby daughter when I was awakened by what I thought to be gun shots outside of my home. Fearful of someone targeting my family I went to my room where I thought my fiancée was sleeping and got her .45 caliber

- 7 -

handgun. I then cautiously proceeded to walk outside my home[.] [A]s I was walking out my door my neighbor was walking out his door. We stopped and noticed each other then spoke briefly about the sound of shots being fired[.] [W]e both started walking around our home[]s when I noticed one of our vehicles parked on the side of my home. I approached the vehicle and noticed it was my fiancée leaned against the back of the driver[']s seat with blood coming out of her mouth. I went back in my house to get my phone to call 911 and to get a towel to help stop the bleeding. I called 911 and stayed on the phone till police arrived on the scene. Officer said he heard shots fired and he pulled up on the scene which is not true. He was dispatched to the scene by the 911 operator[.] I gave a statement of the events outside my home as to what I saw. I was then taken in for further questions and a G.S.R. test was given which proved to be negative and my fiancée['s] .45 caliber handgun was proven not to be the weapon used in the crime as well, but I was still charged for what happened that day.

Following the conclusion of the proof, the jury convicted the defendant as charged of second-degree murder and convicted felon in possession of a handgun. The trial court imposed the sentence recommended by the parties of twenty-one years' imprisonment at one hundred percent release eligibility as a Range I offender for the second-degree murder conviction and four years' imprisonment at thirty-five percent release eligibility as a Range II offender for the handgun possession conviction, to be served consecutively for an effective sentence of twenty-five years' imprisonment. The defendant appealed.

*Analysis*

On appeal, the defendant argues: (1) the evidence is insufficient to sustain his convictions; (2) the trial court committed plain error in providing the jury with an erroneous jury instruction; (3) the trial court committed plain error by allowing the State to introduce a pro se pleading purportedly filed by the defendant; (4) the defendant is entitled to relief based on cumulative error; and (5) the defendant's sentence for convicted felon in possession of a handgun is illegal.

**I. Sufficiency**

The defendant challenges the sufficiency of the convicting evidence. The defendant does not challenge the sufficiency of the elements of either of the offenses, but instead, challenges the proof establishing his identity as the perpetrator and particularly the credibility of the eyewitness testimony against him. The State responds that credibility determinations are within the province of the jury, and the evidence is sufficient to sustain the defendant's convictions. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the

inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

Second-degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). In addition, "[a] person commits an offense who possesses a handgun and has been convicted of a felony." *Id.* § 39-17-1307(c)(1). The identity of the perpetrator "is an essential element of any crime." *Rice*, 184 S.W.3d at 662 (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The identification of the defendant as the perpetrator is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell,* 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010).

In the light most favorable to the State, the evidence shows that the defendant and the victim were in a romantic relationship, but the defendant thought the victim was "sneaky" and was particularly suspicious of the victim's activities with her friend Ms. Buford. On the day of the shooting, during the daylight hours, Mr. Stevenson saw the defendant and the victim arguing outside their home, and the defendant had a gun. Mr. Jackson, who visited Mr. Stevenson, also saw the defendant with a gun. When Mr. Jackson returned to Mr. Stevenson's house later that night shortly before the shooting, he heard the defendant in a lengthy argument with a female.

Mr. Bingham and C.M. both witnessed the actual shooting. Mr. Bingham, who had a clear view of the defendant's and the victim's driveway, was watching television in his bedroom when he heard "[a] loud scream" and looked out his bedroom window. Mr. Bingham saw the defendant and the victim in the driveway, and he saw the defendant shoot the victim. Although the defendant claims that Mr. Bingham's testimony was unreliable because Mr. Bingham stated that he saw "two figured bodies" in the driveway, Mr. Bingham specifically clarified that the "two figured bodies" were the defendant and the victim.

After witnessing the shooting, Mr. Bingham saw the defendant in between the cars trying to pick the victim up and put her in the car. Likewise, upon hearing gunfire from the direction of the defendant's and victim's house, Mr. Stevenson went outside and saw the defendant either bent down between the two cars in the driveway or "fumbling" for something in one of the cars. C.M. stated in her forensic interview that the victim was sitting in a car in the driveway when the defendant shot the victim, and that she saw the shooting from the "door window" in the living room. Mr. Bingham's testimony

corroborates C.M.'s account in that Mr. Bingham testified that he saw one of the victim's daughters "in the door window" during the shooting.

When Mr. Stevenson went back outside five minutes after hearing the gunfire, the defendant appeared neither panicked nor upset. Likewise, Officer Roten described that the defendant was calm and did not seem upset when she arrived on the scene. Both Officer Roten and Mr. Stevenson observed that the defendant's demeanor changed when the victim's family arrived, and he began to cry and "sob and scream[]." The defendant claimed to have performed CPR on the victim, but Officer Roten did not observe any blood on the defendant. From this direct and circumstantial evidence, a jury could find that the defendant shot the victim and also that the defendant possessed a handgun.[1]

Moreover, according to the defendant, the surveillance footage captured the victim coming into the house and then picked up the defendant going outside after the shooting, "but everything in between was gone." Lieutenant Winbush thought it "seemed strange" that the cameras did not capture the shooting. The defendant admitted that he could access the cameras "through Alexa," and the 911 caller could be heard saying, "Alexa show me side camera." The defendant posited that the victim may have erased the footage herself because of her "sneakiness," but it is unclear how the victim could have erased the footage of her own murder. The defendant made a phone call lasting over 26 minutes on the night of the murder before the police took him into custody, and the victim's and defendant's home was burglarized after the police left the scene. Juveniles were seen leaving the burglarized home, and juveniles were later captured with what turned out to be the murder weapon. From this evidence, the jury could infer that the defendant deleted the footage of the murder and arranged for someone to break into the house to dispose of the murder weapon.

The defendant claims that Mr. Stevenson, Mr. Jackson, and Mr. Bingham were not credible witnesses due to either having prior convictions, prior disputes with the defendant, or other reasons to be incredible. However, it is for the jury as the trier of fact, and not this Court, to evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *See Campbell*, 245 S.W.3d at 335. The defendant also attempts to discount C.M.'s statement in her forensic interview that she saw the defendant shoot the victim because C.M. testified at trial that she did not "see anything." However, C.M. testified at trial that she told the truth in her forensic interview, and the jury was within its province to determine that C.M.'s statement was credible.

---

[1] The defendant has a prior conviction for theft of property greater than $500 but less than $1,000, and he does not challenge his status as a convicted felon on appeal.

Viewed in the light most favorable to the State, the sum of the evidence, as accredited by the jury, was sufficient for a rational trier of fact to determine that the defendant committed the second-degree murder of his girlfriend and was a convicted felon in possession of a handgun. The defendant is not entitled to relief.

## II. Jury Instruction

The defendant contends that the trial court provided the jury with an erroneous instruction because it used the language, "the defendant or one for whom the defendant is criminally responsible," in its charge when the legal concept of criminal responsibility was not raised by the proof. The defendant acknowledges that our review is limited to plain error. The State responds that the defendant has not shown that the instructional error rises to the level of plain error. We agree with the State.

It is well-settled in Tennessee that a "defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 873, S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will only be considered prejudicially erroneous if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

We may consider an issue to be plain error when all five of the following factors are met: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. "Moreover, the error must have been of 'sufficient magnitude that it probably changed the outcome of the trial.'" *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) (quoting *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)).

The record shows that the trial court instructed the jury in its preliminary instructions and again in its final instructions that the elements of the offenses could be

proven if the defendant "or one for whom the defendant is criminally responsible" committed the requisite actions. It is undisputed that the State did not rely on a theory of criminal responsibility to establish the defendant's guilt.

Upon review, we determine that the defendant is not entitled to plain error relief because consideration of the issue is not necessary to do substantial justice. In its proof and argument, the State clearly pursued a theory of the defendant's direct responsibility and in fact, dispelled any suggestion of the carjacking suspect being the shooter. This Court has previously found no plain error where there was an improper criminal responsibility instruction, but the proof and arguments did not mention criminal responsibility. *See State v. Gray*, 2013 WL 475015, at \*11 (Tenn. Crim. App. Feb. 6, 2013) (concluding that the defendant failed to establish plain error from an improper criminal responsibility instruction where the State's proof and argument did not mention criminal responsibility), *perm. app. denied* (Tenn. May 9, 2013).

Moreover, contrary to the defendant's characterization as the proof against him being "extremely weak," it is our view that the evidence of guilt was substantial. C.M. stated in her forensic interview that she saw the defendant shoot her mother from the "door window." Mr. Bingham testified that he saw C.M. standing in the "door window" at the time of the shooting. Mr. Bingham had a clear view of the shooting from his bedroom window and identified the defendant as the gunman. Mr. Stevenson heard shots coming from the defendant's direction such that he accused the defendant of shooting. Mr. Jackson heard the defendant arguing with a female in the area where the victim was found shortly before the shooting. Mr. Stevenson and Mr. Jackson both saw the defendant with a gun in his hand earlier on the day of the shooting, and the defendant's behavior after the shooting could be easily characterized as suspicious. We conclude that any error in the instruction given by the trial court did not change the outcome of the trial; therefore, the defendant has failed to establish that he is entitled to plain error relief.

## III. Pro Se Pleading

The defendant argues that the trial court erred in allowing the State to introduce into evidence a pro se pleading titled, "Motion to File Civil Suite [sic] For Wrongful Incarceration and Deformation [sic] Of Character," that was purportedly filed by the defendant because the document was not properly authenticated. The defendant acknowledges that as with the issue above, our review is limited to plain error review. The State responds that the defendant has failed to show entitlement to plain error relief. We agree with the State.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier

- 13 -

of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Evidence may be authenticated through "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *Id.* 901(b)(4). If the facts and circumstances that surround the evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence. *State v. Cannon*, 254 S.W. 3d 287, 296 (Tenn. 2008). In addition, certain documents are self-authenticating and do not require extrinsic evidence of authenticity as a condition precedent to admissibility, including "[d]ocuments accompanied by a certificate of acknowledgment executed in the manner provided by law by a notary public or other officer authorized by law to take acknowledgments." Tenn. R. Evid. 902(8). "Generally, questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record." *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014).

The pleading is recounted in toto in the facts and procedural history above. The defendant's signature is at the bottom of the pleading, along with the date of May 2, 2022. The defendant's signature is also after the certificate of service paragraph with the same date. Under the certificate of service paragraph, Notary Public Diana Hurley avers that the signature was "[s]ubscribed and sworn" before her on May 4, 2022.

Upon review, we determine that the defendant is not entitled to plain error relief because there was no breach of a clear and unequivocal rule of law and consideration of the issue is not necessary to do substantial justice. First, the pro se pleading was presumably self-authenticating under Tennessee Rule of Evidence 902(8) as an acknowledged document. *See Montague v. State*, 2001 WL 1011464, at *1 (Tenn. Crim. App. Sept. 4, 2001 ("In Tennessee, acknowledged documents are ones which have been notarized by a notary public or acknowledged in the presence of an official. *See generally* Cohen, *Tennessee Law on Evidence* § 9.02[10] (4th ed. 2000)."). In any event, if not self-authenticating, the appearance and substantive contents of the pleading in conjunction with the circumstances reasonably establish the identity and integrity of the evidence. *See* Tenn. R. Evid. 901(b)(4). Defense counsel acknowledged that the pleading "was filed by the defendant in civil court," effectively conceding the defendant drafted the pleading. The pleading contained factual information about the night of the shooting that only the defendant would have known, the defendant repeatedly signed the pleading, the pleading was notarized, and the pleading was sent to the criminal court clerk in an envelope bearing the defendant's name and booking number. These circumstances provided a sufficient basis for the trial court to determine the pleading was authenticated.

Moreover, consideration of the issue is not necessary to do substantial justice. Contrary to the defendant's assertion that the pleading "was extremely damaging," our

review indicates that the pleading was but a small part of the State's case and there was ample evidence of the defendant's guilt, summarized above, aside from the motion. The defendant is not entitled to plain error relief.

## IV. Cumulative Error

The defendant also contends that the cumulative effect of the errors alleged above entitles him to a new trial. While the defendant arguably waived this issue for failing to raise it in his motion for new trial, waiver notwithstanding, the defendant is not entitled to relief. The cumulative error doctrine applies when multiple errors were committed during trial, each of which alone would have constituted harmless error, but in the aggregate have a cumulative effect on the proceedings so great the defendant's right to a fair trial can only be preserved through reversal. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Circumstances warranting reversal of a conviction under the cumulative error doctrine "remain rare." *Id.* "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Id.* at 77. Because the defendant has not established any error, he is not entitled to relief under the cumulative error doctrine

## V. Illegal Sentence

The defendant lastly argues that his sentence for convicted felon in possession of a handgun is illegal. The parties agreed to, and asked the trial court to impose, a sentence where the defendant would serve twenty-one years' imprisonment at one hundred percent release eligibility as a Range I offender for the second-degree murder conviction and four years' imprisonment at thirty-five percent release eligibility as a Range II offender for the handgun possession conviction, to be served consecutively for an effective sentence of twenty-five years' imprisonment. The defendant now contends that the sentence the trial court imposed on his felon in possession of a handgun conviction is illegal because he received thirty-five percent release eligibility, but the statute required eighty-five percent release eligibility. *See* Tenn. Code Ann. § 40-35-501(y)(1) and (y)(2)(C). The defendant asserts that "[b]ecause the parties were operating under an erroneous understanding of the law, this case should be remanded back to the trial court to give the parties an opportunity to renegotiate the sentence using the proper percentage." The State asserts that this Court should remand for entry of the statutorily authorized release eligibility in the judgment for that conviction. We agree with the State.

At the sentencing hearing, the defendant acknowledged that he faced a potential sentence of twenty-five years on the second-degree murder conviction consecutive to six years for the convicted felon in possession of a handgun conviction, for a possible effective sentence of thirty-one years, and the trial court indicated that it had intended to impose "the

maximum penalty for both of these charges [and] running them consecutive." However, the trial court opted to accept the State's recommendation on the sentence in order not to "cause any more discomfort for the family." We understand the defendant's position that he might not have "agreed" to as much time if he had known the correct release eligibility, but this was not a bargained-for plea agreement situation. This was simply a sentencing recommendation presented by the State where the trial court ultimately determined what sentence to impose. Moreover, "[t]he trial court is not required to accept the sentences recommended by the [S]tate, even if agreed to by the [defendant]." *State v. Seay*, 945 S.W.2d 755, 766 (Tenn. Crim. App. 1996). There is nothing for the parties to renegotiate. Therefore, we remand for entry of a corrected judgment noting the proper release eligibility of eighty-five percent for the defendant's handgun conviction.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court, but we remand for entry of a corrected judgment in count two indicating the statutorily authorized release eligibility of eighty-five percent on the handgun conviction.


_____

J. ROSS DYER, JUDGE